

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00276-CV

———————————————

MARILYN GARNER, CHAPTER 7 TRUSTEE OF THE BANKRUPTCY ESTATE
OF J&D RESTAURANT GROUP, LLC, Appellant

V.

JACK IN THE BOX INC. AND JACK IN THE BOX EASTERN DIVISION L.P.,
Appellees

---

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-291340-17

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

J&D Restaurant Group, LLC (J&D) became a multi-unit Texas Jack in the Box franchisee in 2011. But within six years—with both sides hotly contesting what happened and blaming the other—Appellees Jack in the Box Inc. (JIB) and Jack in the Box Eastern Division L.P. (JIBED) (collectively the JIB Parties) had terminated J&D's Franchise and Lease Agreements, and J&D had contractually surrendered all of its Jack in the Box restaurants and assets to JIBED and filed for Chapter 7 bankruptcy protection.

Hoping to obtain funds to distribute to J&D's creditors, J&D's bankruptcy trustee, Appellant Marilyn Garner, sued the JIB Parties for damages she contends the JIB Parties caused under numerous legal theories: breach of the Franchise and Lease Agreements; breach of the implied covenant of good faith and fair dealing under California law (the implied-covenant claim); violations of the California Franchise Relations Act (CFRA), the Texas Uniform Fraudulent Transfer Act (TUFTA), the Texas Deceptive Trade Practices Act (DTPA), both Texas's and California's versions of the Uniform Commercial Code (UCC), and the California Unfair Practices Act (CUPA); and fraud by nondisclosure. The trial court granted summary judgment that Garner take nothing on her CFRA, TUFTA, DTPA, UCC, and fraud-by-nondisclosure claims, and the remaining claims were tried to a jury.

Among its findings, the jury rejected Garner's claims for alleged breaches of the Franchise and Lease Agreements. The jury found in Garner's favor on her

2

implied-covenant and CUPA claims and found $8 million in damages on the implied-covenant claim but no damages under CUPA.

JIB sought a judgment notwithstanding the verdict (JNOV) on the adverse implied-covenant and CUPA findings. Ultimately, the court granted JIB's requested JNOV and signed a final judgment that Garner take nothing. Garner's post-trial motions were overruled by operation of law.

Garner has appealed, raising six overarching yet multifaceted issues: (1) she argues that the trial court erred by entering a take-nothing judgment in the JIB Parties' favor; (2) she challenges most of the summary-judgment rulings;[1] (3) she complains about the trial court's failure to award her attorney's fees; (4) she seeks a new trial; (5) she challenges one of the trial court's evidentiary rulings; and (6) she alleges sundry charge errors. Because we conclude that Garner has not shown grounds for reversal, we will affirm.

## I. Background Facts and Procedural History

### A. Jack in the Box has created a recognizable brand and business.

Founded in 1951 in San Diego, California, Jack in the Box is a well-established fast-food chain in the United States, with around 2,200 restaurants. Known for its 24-hour operations and large menu; its comical, besuited mascot, "Jack"; and its quirky marketing campaigns, Jack in the Box has built a strong brand and business.

---

[1]Garner does not challenge the trial court's ruling that she take nothing on her CFRA claims.

3

Originally, its restaurants were primarily corporate-operated, but most are now franchisee-operated.

**B. J&D became a Jack in the Box franchisee.**

In 2011, J&D paid JIBED $16.3 million for the right to operate 37 previously corporate-operated Jack in the Box restaurants in Texas. J&D signed two sets of documents for each location: (1) Franchise Agreements with JIB granting J&D a "limited license" to use JIB's name, systems, and trademarks during each contract's term (ending January 30, 2027), and (2) Lease Agreements with JIBED.

In exchange, J&D agreed to pay JIB royalty and marketing fees based on its monthly gross sales. J&D also agreed to pay rent to JIBED and all property taxes. The parties agreed to these amounts in the original purchase agreement and restated them in the Franchise and Lease Agreements. To secure payment, J&D granted JIB a security interest in the assets J&D used in operating the restaurants.

Among other obligations, the Franchise Agreements required J&D to designate a restaurant operator holding a franchise-ownership interest in an amount subject to JIB's approval; adhere to and meet all JIB standards, specifications, and procedures; maintain the buildings, premises, and equipment in good condition and make repairs and improvements as JIB might require; serve the entire menu; and have a certified restaurant manager at each location.

Each Franchise Agreement also contained a clause governing the sale of an interest in an agreement or franchise, and the clause required J&D to give notice to

4

JIB and granted JIB a right of first refusal to purchase the interest. If JIB did not exercise this right, J&D agreed to obtain JIB's written consent to any proposed sale to a third party, which consent could not be "unreasonably withheld."[2] The Franchise Agreements had a California choice-of-law clause.

Under the Lease Agreements, J&D agreed to maintain and repair the premises and building facilities and to replace damaged equipment. Texas law governed the Lease Agreements.

## C. J&D's operator and ownership changed.

Jeff Moosa, J&D's primary financer, later claimed that he realized in the first month that six "bad store[s]" were impacting J&D's profitability.[3] But whether it was because of this or other reasons, very early, J&D's ownership and operator changed.

In 2012, Eric Miller, who was a J&D member and its operator, acquired six of J&D's units—although none of the "bad store[s]"—and left J&D with 31 locations.

---

[2]Throughout this opinion, we discuss the proposed sale of J&D's restaurants, but under the Franchise Agreements, J&D's sale of its restaurants must be understood not as J&D's selling something that it completely owned; rather, J&D was attempting to sell its interest in the Franchise Agreements—in other words, to transfer its limited license—because JIB's "right, title and interest to the System and the Marks . . . remain[ed] vested solely in JIB."

[3]Moosa also complained that the closing was rushed and J&D unexpectedly had to spend another $700,000 for repairs soon after closing—even though J&D acknowledged under the Lease Agreements that it had inspected the restaurants and had accepted the premises and equipment "AS IS."

Soon after, two other J&D members departed, including Moosa's brother, leaving Moosa as the only original member.

In July 2012, Moosa hired Bernard Morrissey to be J&D's operator and gave Morrissey a 25% ownership interest in J&D for his sweat equity. Although Moosa thought that expansion would make J&D profitable, in July and August of 2013, JIB refused J&D's expansion request, pointing out numerous performance problems.

After this refusal, Moosa decided that he too wanted to leave Jack in the Box. So in May 2014, Morrissey acquired Moosa's interest in J&D and became its sole member. JIB approved this transfer.[4]

**D. J&D's operational problems grew.**

According to JIB, even before the ownership and operational changes, J&D had exhibited "alarming" and "substandard performance." In November 2013, JIB warned J&D about various compliance and staffing issues, including its lack of certified restaurant managers—impacting service, sales, and customer satisfaction— which violated J&D's Franchise Agreements. Shortly after, in early 2014, JIB pointed out more noncompliance areas and again warned that half of J&D's restaurants lacked a certified restaurant manager.

By its 2014 fourth-quarter review, J&D's performance ranked "among the worst" when compared to other Jack in the Box franchisees. Among other issues,

---

[4]Simultaneously, Morrissey, J&D, and Moosa executed an Assignment of Net Profits Interest. At trial, the parties disputed whether JIB knew about this separate— and what JIB called a "secret"—agreement.

nearly one third of J&D's restaurants still did not have a certified restaurant manager, which JIB again told Morrissey "[wa]s in violation of [J&D's] franchise agreement." JIB advised that having "certified RM[s] is your critical lever. Without moving this[,] nothing else will move for the long term."

J&D's operational issues worsened in February 2015 when the McLennan County Health Department threatened to close J&D's five McLennan County locations because of health violations. JIB counseled J&D about its operations, offering encouragement and instruction for improvement.

Yet J&D's operational performance remained in decline when J&D received its annual review in July of 2015. J&D's sales had increased at a slower pace than the overall system as its number of transactions decreased. "Every quarter had numerous food[-]safety failures" with not only "no improvement" but decline "at an alarming rate." JIB wrote, "You again were considerably worse than the Franchise System," ranking below both the overall system and the North Texas area in a number of key metrics.

Thirteen restaurants' drive-thru lanes were not open 24 hours a day, seven days a week, and in terms of speed of service, J&D was "consistently an outlier," providing slow service for "the third year in a row." JIB summarized the issues in J&D's annual review, stating bluntly, "Bottom line is you achieve poorer results faster."

JIB again pointed out staffing issues, including the lack of certified restaurant managers and "no bench strength." JIB gave multiple suggestions for improvement

7

and told J&D that it "must step up to turn this ship around" because "[i]t is clearly headed in the wrong direction." JIB cautioned that its brand would "suffer if there [was] a third year of consecutive decline."

On the heels of the July review, J&D failed two food-safety audits. So in August 2015, JIB sent J&D a Notice of Action to Prevent Default under J&D's Franchise and Lease Agreements. JIB outlined curative food-safety steps for J&D to avoid a default and suggested that "JIB [was] available to help [J&D] explore alternative options that may help avoid potential future defaults[,] . . . includ[ing] . . . selling some or all of [J&D's] restaurants." As Morrissey worked on operations, he started thinking about selling.

**E. JIB sent J&D a notice of default.**

Morrissey claims that he cured the pointed-out problems in response to the August notice, but JIB characterized the changes as J&D's making "small strides" when "[t]here was a lot to do."[5] On April 25, 2016, JIB sent J&D a Notice of Default, outlining multiple default grounds and an opportunity to cure to avoid termination of

---

[5]To illustrate, Morrissey admitted that JIB learned of video taken at a J&D restaurant showing water pouring through a ceiling over a grill while a gloveless employee handled food. Morrissey acknowledged that both situations were unacceptable and said he had addressed them.

the Franchise and Lease Agreements.[6] J&D's lender also separately sent its own default notice on May 17, 2016.[7]

Suffice it to say that J&D had ongoing operational and financial issues that J&D was addressing on two fronts. First, it worked to cure the operational defaults, which Morrissey outlined in a letter to JIB. Second, Morrissey contacted Auspex Capital, Inc.—a company that brokered fast-food restaurants—to help sell J&D's restaurants.

But soon after JIB sent its default notice, it received a customer complaint about J&D's Madisonville location—a location that Morrissey later claimed he had wanted to close but JIB had not allowed. The customer described the location as "nasty" and said she ended up in the hospital with food poisoning: "No more Jack sourdough bacon burger for me."

When the location failed a health inspection—with notes of a "[f]ilthy microwave, [b]ug carcasses; [and b]ulk foods opened and not covered"—and J&D failed to cure the default issues, JIB terminated the Madisonville location's Franchise and Lease Agreements. Yet Morrissey testified that JIB "lifted" the termination "over

---

[6]A default under any one of J&D's Franchise or Lease Agreements constituted a default as to all of its Franchise and Lease Agreements.

[7]Morrissey testified that "it was basically an accounting situation. And it was explained to the lender, and there was no action taken on the default."

the phone," so J&D "continued to operate the restaurant," paying rent, royalties, and marketing fees.

**F. JIB sent J&D a revised notice of default.**

In the summer of 2016, JIB wanted to "get [its] hands around" the scope of J&D's issues, so it hired Newport Construction to inspect J&D's restaurants, facilities, and equipment. Each side viewed Newport Construction's hiring quite differently.

According to JIB, it had hired Newport to "objectively document all of the things that were wrong" with J&D's equipment and facilities. JIB said it wanted J&D to understand the significance of the restaurants' issues and was looking "to partner with [Morrissey] to get through it all." But because JIB found Newport's results to be "frightening," it sent a revised Notice of Default to J&D on September 11, 2016. That revised notice built on the April notice and outlined three sets of "[o]pportunit[ies] to [c]ure" by October 11, November 11, and December 31, 2016.

On the other hand, J&D called JIB's hiring of Newport "unprecedented." J&D believed that JIB—while feigning praise and help—was "nitpicking," making "a laundry list that [JIB] knew [J&D] would not be able to complete," and "concoct[ing] deficiencies for each J&D Restaurant."

**G. J&D tried to sell the 31 restaurants by the end of 2016.**

While J&D tried to cure the defaults, its broker Auspex looked for potential buyers. By September 26, Auspex had received several bids, and over time, three potential buyers showed interest beyond "kicking the tires": (1) Kenneth Durrett and

Ben Hidalgo (the Durrett–Hidalgo Group); (2) Umar Ibrahim; and (3) Arnold Dominguez and Hidalgo (the Dominguez–Hidalgo Group).

JIB—whose consent to sell was required—initially expressed interest in the Durrett–Hidalgo Group. J&D signed a nonbinding letter of intent to sell to that group for $13 million, which Auspex provided to JIB.

Hidalgo had no restaurant experience; he and his family were the primary financers of the deal. Durrett—who operated a group of nine Long John Silver's—was the proposed operator. JIB reviewed the Durrett–Hidalgo Group's proposal, met with both men, and inspected Durrett's Long John Silver's restaurants. On November 10, J&D and the Durrett–Hidalgo Group signed an Asset Purchase Agreement that Auspex sent to JIB the next day. Notably, the agreement's $13 million purchase price was "subject to adjustment," it had a due-diligence period, and it lacked completed attachments.

But this contract was never consummated because JIB determined that the Durrett–Hidalgo Group did not satisfy its Franchisee Approval Standards—among other things, JIB "found [Durrett's] operations to reflect a weak [o]perator." Thus, on November 14, JIB notified Durrett that "it [wa]s not in the best interest of either [Durrett] or the company to approve [him] as a franchise owner," ceased processing his application, and withheld consent to J&D's proposed sale to the Durrett–Hidalgo Group.

Although JIB's letter did not state its reasoning, the Durrett–Hidalgo Group had not finalized financing, had not negotiated a final purchase price, and had not completed due diligence. Indeed, the very day JIB withheld consent, the Durrett–Hidalgo Group's lender had notified the group that it had not approved the financing, and Hidalgo testified that for the deal to have gone forward, the Durrett–Hidalgo Group and J&D would have needed to "renegotiate the price or figure out some other solution"—including terminating the proposed deal.

Meanwhile, Morrissey claimed to be working to meet J&D's three cure deadlines and informed JIB of his progress, including claiming to now have certified restaurant managers in 30 of 31 restaurants.[8] JIB continued to encourage Morrissey.

In late 2016, Morrissey reached out to Umar Ibrahim—who was already a Jack in the Box franchisee—to gauge his interest in acquiring J&D's restaurants, and Ibrahim initially texted Morrissey that he was agreeable to a $10,611,000 price. But Ibrahim and J&D never executed any agreement. Ibrahim testified, "I did not make an offer. There was a verbal because the purchase agreement was never signed."

During December, JIB visited J&D's locations and recapped continuing issues and "[u]nacceptable visit[s]." As the December 31 cure deadline approached, Morrissey knew he could not cure everything. He emailed JIB's then-CEO asking for a personal meeting because he needed help and wanted to sell J&D's restaurants.

_____

[8]J&D said the 31st person had had a stroke and could not train.

Morrissey made it known that he wanted J&D's sale to close quickly because of its financial condition—he was worried about being able to pay "the tax bill that was coming due." JIB responded that "[w]e all want to find the right solution that protects the brand and allows you time to find the right buyer at a realistic price."

Morrissey also spoke with Eric Tunquist, who was the Vice President of Easten Division Operations. Morrissey said he was "running low on funds" and encouraged JIB to consider Ibrahim as a potential buyer with additional financial concessions—that is, "rent, royalty, and tax relief." Tunquist discussed the possibility of "a temporary operating license (without mentioning terminating the franchise agreement)" and said that Morrissey's attorney "need[ed] to keep dialoguing" with JIB's attorney.

## H. JIB terminated the Franchise and Lease Agreements, and J&D briefly operated the restaurants while searching for a buyer.

J&D had not cured everything by December 31. And as Morrissey had feared, J&D's January 25th $465,691.85 property-tax payment bounced, which JIB informed J&D on January 31 violated its Franchise Agreements. J&D's not paying its bills was the "final straw" for the JIB Parties.

That day, the JIB Parties notified J&D that they were terminating the Franchise and Lease Agreements.[9] The Franchise Agreements stated that J&D's right to use JIB's name, marks, and system—in other words, J&D's "limited license"—"shall

---

[9]The notice covered all 31 restaurants, including the Madisonville location.

13

terminate" upon the Agreements' termination. J&D was thus supposed to de-identify as Jack in the Box. Under Paragraph 18.G of the Franchise Agreements, JIB had the option "to purchase all usable inventory of food supplies, paper goods, containers, printed menus[,] and other materials bearing JIB's trade names or Marks at [J&D's] cost[] and to purchase the restaurant equipment, furniture, fixtures[,] and signs at fair market value"—although the agreements also gave JIB lien rights in those assets.

JIB did not immediately take over the restaurants. JIB and J&D negotiated a temporary operating license that they never finalized, and J&D made some additional payments to JIB.[10]

Meanwhile, J&D was still trying to sell its restaurants, and financer Hidalgo found another potential operator, Arnold Dominguez. In February 2017, Auspex forwarded an executed Asset Purchase Agreement between J&D and the Dominguez–Hidalgo Group that contained a $10.5 million purchase price. Similar to the unconsummated Durrett–Hidalgo Group's purchase agreement, the Dominguez–

---

[10]Garner later accused the JIB Parties of "extract[ing]" money from J&D during the post-termination, pre-surrender period, but she offered no evidence of the proposed temporary operating license's terms, as that license never came to fruition. Nor did she explain how J&D did not owe the payments J&D made. Morrissey testified that he paid over $300,000, but he freely admitted that J&D did not otherwise continue paying rent (which had doubled because of J&D's holdover), royalties, or marketing fees while J&D kept operating—and selling food—under Jack in the Box's name. And there is no evidence that J&D ever reimbursed the JIB Parties for the $465,691.85 they paid for what J&D owed in property taxes.

14

Hidalgo Group's Agreement's purchase price was "subject to adjustment," and the Agreement allowed for a due-diligence period and lacked completed attachments.

## I. As J&D negotiated with the third potential buyer, the JIB Parties sued J&D and Morrissey.

On April 3, the JIB Parties sued J&D and Morrissey to force them to cease operating under JIB's name, marks, and system and to surrender the restaurants. It is unclear when J&D learned of the suit, but by April 9, during the Dominguez–Hidalgo Group's due-diligence period, Hidalgo became unwilling to pay $10.5 million: "The pricing was not going to work."[11] Apart from the unresolved pricing and deal structure, JIB determined that the Dominguez–Hidalgo Group did not satisfy its Franchisee Approval Standards anyway, so on April 25, JIB declined the Dominguez–Hidalgo Group's franchise application.

## J. J&D and Morrissey surrendered their restaurants and filed for bankruptcy.

Without having JIB's consent to sell, Morrissey characterized the JIB Parties' lawsuit as "a gun to his head," such that by May 1, he and J&D contractually surrendered possession and control of J&D's restaurants and assets to JIBED. Shortly after, Morrissey and J&D filed for bankruptcy, and Garner was appointed J&D's bankruptcy estate's trustee.

---

[11]Hidalgo told JIB that "[t]he portfolio of restaurants ha[d] declined in value to well below the outstanding debt," which he said exceeded $11 million. Hidalgo said that he wanted to propose another "deal structure plan" and warned that because of the "distress in these restaurants," "any group looking to buy these restaurants out of bankruptcy would not be willing to pay more than $5–6mm."

**K. JIB rehabilitated, reopened, and refranchised most of the restaurants.**

A JIB witness testified that by the time of J&D's surrender, the restaurants "had gone from very bad to worse." JIB brought in a former corporate manager to assess, rehabilitate, and operate J&D's surrendered locations.

After visiting the locations and meeting with Morrissey, the manager "got scared" at the state of the facilities, equipment, and staff. Roofs were unsound, including one with an HVAC unit that was about to "crash into the kitchen." On average, the restaurants had only one working fryer instead of the requisite four. Many of the functioning grills did not heat properly, which risked food-safety issues. A dozen HVAC units needed replacing. The restaurants were understaffed and lacked certified restaurant managers, and the employees were underpaid and undertrained.

JIB's manager thought that, of the 31 locations, only two could properly and safely operate. So the JIB Parties shut down all the locations to rehabilitate the facilities and equipment and to hire and train employees, and it paid the employees during the closures.

According to the JIB Parties, they invested over $9 million to rehabilitate the locations and settle disputes with J&D's lienholders. Nearly all restaurants reopened by the second week of June 2017, but over time, JIBED decided to permanently close several—including some of the "bad store[s]" that J&D had also wanted to close.

16

On November 20, 2017, JIB sent a UCC notice letter to J&D—including Garner—proposing to retain the assets J&D had surrendered in satisfaction of J&D's obligations to JIB. Neither Garner nor J&D responded.

While J&D was trying to sell its restaurants before surrendering them, the JIB Parties were working on a corporate-wide strategy to increase the percentage of franchisee-operated restaurants. In early December 2016, the JIB Parties worked to franchise around 300 corporate-operated locations.

Between August of 2017 and March of 2018, JIBED packaged 23 of the former J&D restaurants with 53 other corporate-operated locations and sold them in "tranches" to three groups, including one involving Ibrahim. As part of the sales, the buyers negotiated royalty and rent relief and some store closures. Garner and the JIB Parties dispute whether the JIB Parties profited from these transactions.

## L. Garner intervened and sued the JIB Parties.

In April 2019, the bankruptcy court approved Garner's request to intervene in the JIB Parties' lawsuit, which had been automatically stayed when J&D filed for bankruptcy. She alleged 11 causes of action: (1) JIB breached the Franchise Agreements; (2) JIB breached its implied covenant of good faith (under California law) concerning the Franchise Agreements; (3) JIBED breached the Lease Agreements; (4) JIB violated Section 24.005(a)(2) of TUFTA; (5) JIB violated Section 24.006 of TUFTA; (6) JIB violated Sections 20020 and 20022 of CFRA; (7) JIB violated Sections 20028 and 20029 of CFRA; (8) the JIB Parties violated the DTPA;

17

(9) the JIB Parties violated both Texas's and California's versions of the UCC; (10) "Jack in the Box"[12] violated CUPA; and (11) the JIB Parties committed fraud by nondisclosure.

## M. After two summary-judgment rulings, a jury trial, and post-judgment rulings, Garner took nothing in the final judgment.

In two pretrial rulings, the trial court granted summary judgment that Garner take nothing on her CFRA, TUFTA, DTPA, UCC, and fraud-by-nondisclosure claims. The remaining claims were tried in a multi-week trial involving 19 witnesses and voluminous exhibits.

On the question of what happened to J&D's restaurants, Garner offered evidence that J&D faced issues with sales, employee recruitment, and aging buildings and equipment and that JIB did not adequately help J&D. Among other things, Morrissey testified about JIB's approval of a competing franchise on Fort Hood that Morrissey believed had negatively affected J&D's five Killeen locations' profitability. He also testified about repeatedly asking to close J&D's most unprofitable restaurants—what Moosa called the "bad store[s]"—and pleading for rent and royalty relief—which he understood other franchisees had been granted—which JIB never

---

[12]Garner initially sued the JIB Parties, but her fourth and fifth amended petitions—the latter of which was filed after the close of evidence—named the undefined "Jack in the Box." Because of our resolution of Garner's issues, we need not determine whether the trial court properly allowed Garner's trial amendment, which the JIB Parties contend was error. *See* Tex. R. App. P. 47.1. Our analysis treats the fifth amended petition as Garner's operative pleading.

18

granted J&D. Garner similarly complained about certain roof designs that J&D argued that the JIB Parties should have paid to fix instead of blaming J&D for the defective design's resulting problems. And Garner offered evidence to claim that (1) some of the default issues preexisted J&D's purchase and were things that JIB was supposed to have fixed; and (2) J&D had cured the default grounds, including some of those preexisting issues.

Ultimately, Garner asserted that the JIB Parties had unfairly withheld consent to the proposed sales, coercively seized J&D's multi-million-dollar investment, and unconscionably resold its restaurants—including to Ibrahim, who had been a potential pre-termination buyer before he had "ghosted J&D after talking to JIB"[13]— to enrich the JIB Parties while driving J&D into bankruptcy. In support of her damages claims, Garner called no expert witness but relied exclusively on J&D's $13 million and $10.5 million unconsummated purchase agreements and its texts with Ibrahim, arguing that they were evidence of J&D's fair market value.

The JIB Parties, in contrast, offered evidence supporting their position that Morrissey was a bad operator who consistently poorly ran J&D's restaurants and who was to blame for putting J&D into a "death spiral." They maintained that they had treated J&D fairly, had wanted J&D to succeed, had given it multiple second-chance opportunities, and could—and perhaps should—have terminated sooner. But when

---

[13]Ibrahim admitted that he had talked with JIB, but as Garner concedes, "Exactly what was said will never be known."

19

J&D continued delivering poor food, "operating badly," and "creat[ing] a poor brand reputation," there was no reason to "reward that behavior" with financial concessions, so they terminated J&D. On the whole, the JIB Parties maintained that they had followed the law and the deals struck in the Franchise and Lease Agreements, had not unreasonably withheld consent to the proposed sales, and had not damaged J&D.

The trial court conducted a lengthy charge conference and submitted 26 jury questions. Among its findings, the jury rejected all of Garner's claims for breaches of the Franchise and Lease Agreements. The jury found in Garner's favor on her implied-covenant claim and found $8 million in corresponding damages based on J&D's fair market value, which the charge constrained to "any time between November 10, 2016 and May 1, 2017." The jury also made affirmative findings on Garner's CUPA-liability questions, but it found no damages.

Garner, JIB, and JIBED filed post-verdict motions. The trial court granted the JIB Parties' request to disregard the jury's findings adverse to JIB and signed a final judgment that Garner take nothing. Garner's motion to vacate or modify the judgment or, alternatively, for a new trial was overruled by operation of law, and Garner appealed.

## II. Overview of Garner's Issues

Garner presents the following six issues:

(1) The trial court erred by signing a take-nothing judgment in favor of the JIB Parties; granting JIB's requested JNOV; and disregarding the jury's affirmative findings in her favor: the liability findings on her implied-

20

covenant and CUPA claims, the $8 million damages finding on the implied-covenant claim, and the finding that J&D did the things that the Franchise Agreements required of it to sell;

(2) The trial court erred by granting summary judgment that Garner take nothing on her TUFTA, DTPA, UCC, and fraud-by-nondisclosure claims;

(3) The trial court erred by failing to award Garner attorney's fees on her implied-covenant and CUPA claims;

(4) The trial court erred by not granting a new trial because "the jury's negative and zero answers [on the breach-of-contract questions and the CUPA damages question] are not supported by legally or factually sufficient evidence";

(5) The trial court erred by excluding two exhibits concerning out-of-state franchise applications; and

(6) The trial court committed charge error in its submission of certain questions.

In sum, Garner attacks the disposition by summary judgment and jury trial of nine claims, challenges every adverse jury finding, disputes the trial court's disregarding favorable jury findings, and raises numerous sub-issues. For organizational purposes, we will analyze her issues on a claim-by-claim basis.

## III. The Breach-of-Franchise-Agreements Claims Against JIB

In her first, fourth, fifth, and sixth issues, Garner complains that the trial court should not have rendered judgment that she take nothing on her claims against JIB for breach of the Franchise Agreements. She raises two charge issues, complains about excluded evidence, and asserts that the trial court should have granted her a new trial because "the jury's [adverse] answers [were] not supported by legally or factually sufficient evidence." We reject her complaints.

21

## A. Standards of review

### 1. Legal sufficiency

A trial court's judgment "shall conform to the pleadings, the nature of the case proved and the verdict," meaning that a trial court should enter its judgment in accord with the jury's findings. Tex. R. Civ. P. 301. When a party attacks the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof—as Garner does by attacking the jury's liability findings that JIB did not breach the Franchise and Lease Agreements—the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021). In reviewing a "matter of law" challenge, we must first examine the record for evidence that supports the challenged finding, while ignoring all evidence to the contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If no evidence supports the finding, then we will examine the entire record to determine if the contrary position is established as a matter of law. *Id.* We will sustain the issue only if the contrary position is conclusively established. *Id.* Evidence conclusively establishes a fact when the evidence leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

### 2. Factual sufficiency

When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, that party must show that the adverse finding

22

is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. In reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or the finding is so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### 3. Charge error

A trial court is required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009). We review a trial court's decisions on jury instructions for abuse of discretion. *Id.* at 856.

## B. Garner's claims for breach of the Franchise Agreements

Garner alleged two main breach-of-contract theories against JIB. One concerned whether JIB had breached the Franchise Agreements by unreasonably withholding consent to J&D's proposed sales to the Durrett–Hidalgo Group and the Dominguez–Hidalgo Group. In the other, she alleged that JIB had breached by terminating the Franchise Agreements.

23

## 1. Breach by withholding consent

Concerning the withholding-consent theories, the trial court submitted eight jury questions, and Garner challenges the jury's adverse "no" findings on Question Nos. 3 and 6. The two questions were nearly identical, except that No. 3 asked about JIB's withheld consent to the proposed sale to the Durrett–Hidalgo Group while No. 6 asked about the Dominguez–Hidalgo Group as follows:

> **Did JIB fail to comply with paragraph 16 of the Franchise Agreements by unreasonably withholding consent to the proposed sale of J&D's Restaurants to the [Durrett– or Dominguez–] Hidalgo Group?**
>
> Regarding consent to a sale, you are instructed that the Franchise Agreements state as follows:
>
> > If JIB does not exercise its option, the proposed sale may nonetheless be concluded only with JIB's written consent to the transfer. Such consent shall not be unreasonably withheld upon compliance with the conditions imposed by JIB on such transfer, including, but not limited to, the following:
> >
> > . . . .
> >
> > B. The prospective purchaser shall be approved as a Franchisee under JIB's standards then in effect, including requirements relating to financial condition, character, managerial qualifications and commitment, and other conditions as JIB may then be applying.
> >
> > . . . .
> >
> > D. JIB may disapprove such terms and conditions of the transaction as it believes may affect the possibility of success of the business in light of the conditions under which it is purchased.

24

> Withholding consent is reasonable if, on the facts of the case, reasonable minds could differ as to whether consent should be withheld. [Indentation altered.]

### a. Alleged charge error

Garner argues in her sixth issue that the trial court erred by including in Question Nos. 3 and 6 the Franchise Agreements' Subparagraph 16.D (quoted immediately above) and the instruction concerning withholding consent. She presents no reversible error.

### i. The Subparagraph 16.D instruction

Garner maintains that the trial court erred by including Subparagraph 16.D in the charge over her objection that the provision was not supported by evidence. But Garner asked for Subparagraph 16.D's inclusion in her First Supplemental Proposed Jury Charge, which she filed after both sides had closed. Although she later objected, Garner may not complain of error that she invited.[14] *See Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) ("Parties may not invite error by requesting an issue and then objecting to its submission."); *Bluestar Energy, Inc. v. Murphy*,

---

[14]Even if Garner had not invited error by proposing Subparagraph 16.D's inclusion before the formal charge conference and then objecting to her own proposed language based on an alleged lack of evidentiary support, the trial court did not abuse its discretion by including Subparagraph 16.D's language. *See* Tex. R. Civ. P. 277; *Hawley*, 284 S.W.3d at 855–56. Although JIB denied both proposed sales without stating its reasons, the challenged instruction tracks the Franchise Agreements' language, and the record contains evidence demonstrating why JIB believed that the terms of the proposed transactions might "affect the possibility of success of the business." *See Hawley*, 284 S.W.3d at 856.

205 S.W.3d 96, 101 (Tex. App.—Eastland 2006, pet. denied); *Daily v. Wheat*, 681 S.W.2d 747, 757 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

### ii. The withholding-consent instruction

Garner also complains that the trial court erred by instructing the jury in Question Nos. 3 and 6 that "[w]ithholding consent is reasonable if, on the facts of the case, reasonable minds could differ as to whether consent should be withheld." Garner failed to preserve this complaint.

Parties must present charge objections "before the charge is read to the jury." Tex. R. Civ. P. 272. And each objection must be specific: "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." Tex. R. Civ. P. 274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). A party's objection must have "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a)(1). General objections do not preserve error. *See* Tex. R. Civ. P. 274; *Burbage v. Burbage*, 447 S.W.3d 249, 255 (Tex. 2014).

Garner objected as follows:

[GARNER'S COUNSEL]: . . . Plaintiff objects to their tender of [the withholding-consent instruction] on the grounds that it's a legally incorrect instruction.

THE COURT: That it's legally incorrect?

26

[GARNER'S COUNSEL]: Yes. It's also a tautology, Your Honor. It doesn't really add anything. [Indentation altered.]

After then holding an off-the-record discussion, the trial court resumed the charge conference, briefly expressed concern about not including an instruction, and then overruled Garner's objections.

Garner's objections that the withholding-consent instruction was "a legally incorrect instruction," a "tautology," and "doesn't really add anything" were not specific enough to make the trial court aware of her specific objections.[15] *See* Tex. R. Civ. P. 274; *Burbage*, 447 S.W.3d at 255; *see also Meyers v. 8007 Burnet Holdings, LLC*, 600 S.W.3d 412, 421–24 (Tex. App.—El Paso 2020, pet. denied) (holding that objection to "confusing" charge language was not specific enough); *Brazos Elec. Power Coop., Inc. v. Taylor*, 576 S.W.2d 117, 119–20 (Tex. App.—Waco 1978, writ ref'd n.r.e.) (holding that party's objection that charge "does not submit the proper measure of damages" was too general (citing *Whitson Co. v. Bluff Creek Oil Co.*, 293 S.W.2d 488, 493 (Tex. 1956)). Accordingly, Garner waived her complaint to the trial court's inclusion of the withholding-consent instructions in Question Nos. 3 and 6. *See* Tex. R. Civ. P. 274.

---

[15]On appeal, Garner cites California and Texas law to explain why she believes the withholding-consent instruction "nudge[d] or confuse[d] the jury." But Garner made none of these specific legal objections to the trial court despite participating not only in an "extensive informal [c]harge conference" but also a lengthy formal charge conference that spans 299 pages of the reporter's record.

## b. Excluded evidence

Garner complains in her fifth issue that the trial court erred by excluding her Exhibit Nos. 326 and 327. She claims this prevented the jury from considering two out-of-state 2015 franchise applications that tended to prove that JIB unreasonably withheld consent to J&D's two proposed sales. We review the trial court's evidentiary rulings for an abuse of discretion, *see Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998), and hold that the trial court did not abuse its discretion by excluding the two exhibits.[16]

Garner argued that the excluded franchise applications were relevant because one applicant "only [had] four years of experience in fast-food" and the other proposed that he would have only a 10% ownership interest. Garner argued that these applications showed that JIB had applied different—that is, more lenient—standards to the two 2015 out-of-state applicants than it had to Durrett or Dominguez, who sought in 2016 and 2017, respectively, to operate J&D's Texas restaurants.

But Garner did not offer any evidence that JIB actually approved either out-of-state application on either's proposed terms.[17] As JIB argued when Garner offered the

---

[16]JIB initially argues that Garner failed to preserve her complaint by failing to make an offer of proof. *See* Tex. R. Evid. 103(a)(2); *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). Because both applications are in the appellate record, we overrule JIB's preservation argument.

[17]Garner argued that she did not have evidence of whether either application had been approved because of JIB's discovery conduct. The trial court responded that JIB had complied with its order "to produce those applications" and was not "under

28

exhibits, "the applications are completely different from . . . the final deal." We question how the 2015 applications would have been relevant to the jury's consideration of whether JIB unreasonably withheld consent to J&D's proposed sales to its two buyer groups; neither 2015 application evidenced JIB's approval decision that could then have been compared to its decisions about J&D's proposed buyers. *See* Tex. R. Evid. 401. Without having presented any evidence that JIB actually approved the two applications on the proposed terms, Garner has not shown that the trial court abused its discretion by excluding those applications under Rule 403. *See* Tex. R. Evid. 403.

### c. Legal and factual sufficiency of the evidence of the breach-by-withholding-consent claim

In her first and fourth issues, Garner challenges the trial court's judgment that she take nothing on her claim for breach of the Franchise Agreements, attacking the legal and factual sufficiency of the jury's adverse findings on Question Nos. 3 and 6. Garner cannot prevail.

Question Nos. 3 and 6 instructed the jury that JIB's consent to the transfer could not be unreasonably withheld if the transfer complied with JIB's conditions, including that a "prospective buyer shall be approved as a Franchisee under JIB's

---

any obligation to produce any more documents." Garner's in-trial discovery complaints were untimely, and she cannot now complain that "the JIB Parties resisted production of other approved franchisee applications." *See Remington Arms Co. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993) (orig. proceeding).

standards then in effect, including requirements relating to financial condition, character, managerial qualifications and commitment, and other conditions as JIB may then be applying." To explain why it withheld consent to J&D's sales to the Durrett–Hidalgo Group and the Dominguez–Hidalgo Group, JIB offered evidence of its then-existing "Franchisee Approval Standards" and of why neither proposed franchisee group met those standards.

Among other things, JIB's standards required the majority owner to have "at least [five] years [of] multi-unit retail, hospitality, or restaurant or other similar . . . ownership in the last 10 years." The standards required the operator to "[h]av[e] full P&L [profit and loss] authority for restaurant-level maintenance and repair, investment in new equipment and facilities, hiring personnel, etc." The operator needed to have "knowledge of the local market" and "[d]emonstrate[] competencies to operate, manage, maintain, and lead the restaurant organization." JIB's standards did not allow passive investors, and the standards required every owner to complete a JIB franchise agreement and, with limited exceptions, sign a personal guaranty.

Regarding the Durrett–Hidalgo Group, the evidence demonstrated the following reasons why JIB withheld its consent to that group's proposed purchase of J&D's restaurants:

- Hidalgo was the financer (for both proposed sales). He worked on "finance and . . . securing capital" but admitted that "[he] didn't have any experience running restaurants."

30

- In connection with the Durrett–Hidalgo Group, Hidalgo attempted to structure his investment with passive investors—family members—who did not want to sign the Franchise Agreements.

- JIB acknowledged that as the proposed operator, Durrett "looked great" on paper. But when a JIB representative made an announced visit to Durrett's Lohn John Silver's El Paso locations, they appeared "terrible" and were some of "the worst" he had ever visited. Among other things, the restaurant staff did not know Durrett, which raised red flags: "[I]t gave [JIB's representative] the impression that [Durrett] wasn't in his restaurants."

- The same JIB representative and another JIB consultant saw similar issues when touring Durrett's Central Texas restaurants. They were concerned about Durrett and his ability to operate 31 JIB restaurants when he already appeared to struggle managing nine Lohn John Silver's restaurants, especially since J&D's distressed restaurants were in bad shape and needed someone with "a strong plan" to turn them around. Overall, JIB determined that Durrett was a "weak operator."

The evidence demonstrates that JIB followed its "Franchisee Approval Standards" and did not unreasonably withhold its consent to J&D's proposed sale to the Durrett–Hidalgo Group. Most notably, Durrett did not meet a number of JIB's standards, including that he "[d]emonstrate[] competencies to operate, manage, maintain, and lead the restaurant organization." We hold that Garner thus failed to demonstrate either that (1) no evidence supports the jury's adverse finding on Question No. 3, *see Francis*, 46 S.W.3d at 242; or (2) its finding is against the great weight and preponderance of the evidence, *see Pool*, 715 S.W.2d at 635.

Regarding the jury's adverse finding on Question No. 6, the evidence showed the following regarding JIB's basis for withholding its consent to J&D's proposed sale to the Dominguez–Hidalgo Group:

- Dominguez did not live in and was unfamiliar with Texas, had never owned a franchise, and had not operated any franchise stores in Texas. In the previous eight years, he had had one year of operating multi-unit restaurants. Although he had worked in various roles within the restaurant industry, he had not had profit-and-loss responsibility since 2013—four years before the proposed sale.

- Dominguez initially planned to get his ownership interest through "sweat equity." But he and Hidalgo never formed an entity through which they would own the 31 restaurants.

- Although Hidalgo proposed giving Dominguez operational authority, Hidalgo wanted approval over all "major decisions," including financing, annual budgeting, and distributions. Hidalgo testified that he was not willing to waive his approval rights.

- A JIB executive testified that Hidalgo's proposal raised "red flags" for JIB, including Dominguez's lack of personal investment in the business and concerns about how the proposed Dominguez–Hidalgo Group's partnership would deal with conflicts. JIB requested their partnership agreement, but Dominguez and Hidalgo did not execute or send one.

- JIB interviewed Dominguez in early March 2017. Dominguez informed JIB that the Dominguez–Hidalgo Group's lender had "approved" a purchase loan, but three days later, that lender informed Hidalgo it was interested but had not committed to lend.

- Hidalgo eventually determined that he was unwilling to move forward on the $10.5 million purchase price and wanted to discuss a restructured deal with JIB.

The evidence demonstrates that JIB withheld its consent to J&D's proposed sale to the Dominguez–Hidalgo Group for a number of reasons: (1) Hidalgo was not willing to move forward with that sale as initially structured; (2) the Dominguez–Hidalgo Group did not have its financing in line; and (3) Dominguez did not meet JIB's "Franchisee Approval Standards" due to his lack of knowledge of the local market, his recent work experience, and his not formalizing the terms of his

partnership and ownership interest. Accordingly, we hold that Garner has also failed to demonstrate either that (1) no evidence supports the jury's adverse finding on Question No. 6, *see Francis*, 46 S.W.3d at 242; or (2) its finding is against the great weight and preponderance of the evidence, *see Pool*, 715 S.W.2d at 635.

## 2. Legal and factual sufficiency of the breach-by-termination claim

On Garner's theory that JIB breached the Franchise Agreements by terminating them, the trial court submitted five jury questions, and Garner challenges the jury's adverse "no" findings on Question Nos. 14 (J&D's noncompliance) and 15 (J&D's excuse), which resulted in the jury's not answering Question Nos. 16 (the breach question), 18 (harm), and 20 (damages).[18] Bedrock California contract law requires that a party "seek[ing] to enforce a contract must show that [it] has complied with the conditions and agreements of the contract on [its] part to be performed." *Pry Corp. of Am. v. Leach*, 2 Cal. Rptr. 425, 429–30 (Cal. Dist. Ct. App. 1960) (citing *Cameron v. Burnham*, 80 P. 929, 930–31 (Cal. 1905)).

The court's charge thus asked the following about Garner's breach-by-termination claim:

> **Question No. 14**
>
> **Did J&D do all, or substantially all, of the significant things that the Franchise Agreements required it to do before JIB terminated the Franchise Agreements?**

---

[18]Question Nos. 17, 19, and 21 asked about breach of the Lease Agreements.

. . . .

**Question No. 15**

   **Was J&D excused from having to do all, or substantially all, of the significant things that the Franchise Agreements required it to [do] before JIB terminated the Franchise Agreements?**

   . . . .

The court's charge then instructed the jury to answer Question No. 16—whether "JIB fail[ed] to comply with the terms of the Franchise Agreements by terminating them"—only if it had answered "yes" to Question No. 14 or Question No. 15, which the jury had not.

Garner argues that "[t]he jury should have answered 'yes'" to Question Nos. 14 or 15. Garner cannot prevail on this complaint.

The evidence showed the following:

- J&D'S operations were "alarming" and "substandard" from 2013 through 2016. JIB repeatedly warned J&D before the January 31, 2017 termination about things that J&D was failing to do that violated J&D's Franchise Agreements.

- J&D constantly lacked the requisite number of certified restaurant managers.

- It failed multiple food-safety audits and health inspections.

- Its lender sent a notice of default.

- J&D's operational performance was "considerably worse than the Franchise System" and it "achieve[d] poorer results faster" than other franchisees.

- The September 2016 revised notice of default set out three groups of default areas that J&D needed to cure, and the final cure deadline was December 31, 2016.

34

- As J&D's December 31, 2016 cure deadline approached, JIB officials visited J&D's restaurants in December and recapped continuing issues and "[u]nacceptable visit[s]." Those visits confirmed that J&D still had not cured all the defaults.

- Although J&D verbally claimed to be curing defaults, it failed to verify and prove its curative efforts.

- At trial, Morrissey admitted that J&D "had defaults" and did not cure them all by the December 31, 2016 deadline. JIB also adduced testimony from its own witnesses that J&D did not cure all the defaults.

- Indeed, after JIB took over J&D's operations in May 2017, JIB's manager was "scared" at the state of the facilities, equipment, and staff. Roofs—which had supposedly been fixed—were unsound. On average, the restaurants had only one working fryer instead of the requisite four. Many of the functioning grills did not heat properly. A dozen HVAC units needed replacing. The restaurants were understaffed and lacked certified restaurant managers, and the employees were underpaid and undertrained.

This evidence supports the jury's finding that J&D did not "do all, or substantially all, of the significant things that the Franchise Agreements required it to do before JIB terminated the Franchise Agreements." And although the evidence demonstrates that (1) JIB encouraged, supported, and praised J&D as it struggled (but admittedly failed) to complete curative efforts by December 31, 2016; and (2) J&D paid royalties, rents, and other amounts that it owed (before failing to pay its property taxes in January of 2017), such evidence did not allow reasonable minds to differ about whether J&D was excused from its pre-termination defaults and nonperformance under the Franchise Agreements.

Indeed, the Franchise Agreements each provided that "JIB's failure to terminate this Agreement upon the occurrence of one or more of the above events

35

[the default grounds] shall not constitute a waiver, or otherwise affect the right of JIB to terminate this license because of any other occurrence of one or more of the aforesaid events." Additionally, the Franchise Agreements included a "Non-Waiver" clause stating that "JIB . . . shall not be deemed to have waived or impaired any [contract] right" by delaying or exercising its rights or by accepting payments from J&D after a breach. Such non-waiver clauses are enforceable. *See, e.g., Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481–82 (Tex. 2017); 13 Williston on Contracts § 39:36 (4th ed. 2025) ("Anti[-]waiver provisions seek to give a contracting party some assurance that its failure to require strict adherence to a contract's term will not result in a complete and unintended loss of its contract rights if it later decides that strict performance is desirable."). So the fact that JIB accepted the money J&D owed under the Franchise and Lease Agreements and encouraged J&D to cure the defaults or find a buyer—as opposed to terminating J&D sooner—did not excuse J&D's nonperformance. *See, e.g., Gould v. Corinthian Colls., Inc.*, 120 Cal. Rptr. 3d 943, 947 (Cal. Ct. App. 2011) (stating that a contract's anti-waiver provision "militate[s] against a finding of waiver under most circumstances"); *Hersch v. Citizens Sav. & Loan Ass'n*, 194 Cal. Rptr. 628, 631 (Cal. Ct. App. 1983).

As JIB points out, Garner did not plead for, request, or obtain a jury finding that JIB had waived the Franchise Agreements' non-waiver clauses. *See Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 95 Cal. Rptr. 2d 583, 592 (Cal. Ct. App. 2000) ("Whether there has been a waiver is usually regarded as a question of fact to be determined by

36

the jury."); *see also Vance v. Popkowski*, 534 S.W.3d 474, 481 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding that appellees who did not secure jury findings on waiver of the non-waiver provision waived that defense). Thus, the evidence—including the Franchise Agreements' non-waiver provisions—supports the jury's finding that J&D's nonperformance before termination was not excused.

We conclude that Garner failed to demonstrate either that (1) there is no evidence to support the jury's adverse findings on Question Nos. 14 and 15, *see Francis*, 46 S.W.3d at 242; or (2) these findings are against the great weight and preponderance of the evidence, *see Pool*, 715 S.W.2d at 635. Accordingly, Garner's claim that JIB breached the Franchise Agreements by terminating them is barred by the jury's findings on Question Nos. 14 and 15 concerning J&D's unexcused nonperformance under the Franchise Agreements before JIB terminated those agreements. We thus overrule Garner's first, fourth, fifth, and sixth issues to the extent she complains about the trial court's judgment that she take nothing on her claims for breach of the Franchise Agreements.

## IV. The Breach-of-Lease-Agreements Claim Against JIBED

Like her challenge concerning Question Nos. 14 and 15, in her first and fourth issues Garner challenges the jury's adverse finding on Question No. 17—regarding her breach-of-lease claims against JIBED—arguing that "[t]he jury should have answered 'yes' to" the following question:

37

**Question No. 17**[19]

**Did JIBED fail to comply with the terms of the Lease Agreements by terminating them?**

Under Paragraph 22 of the Lease Agreement, "[t]ermination, default, or revocation of the Franchise Agreement for any reason, either in whole or in part, . . . shall terminate [a] Lease, without further notice being required."

A Lease Agreement also could be terminated upon an event of default by J&D under Paragraph 23 of the Lease Agreements[.] [Indentation altered.]

Garner makes two arguments: First, she argues that "the evidence shows that JIB breached the [F]ranchise [A]greements by terminating, thus not authorizing lease-agreement termination under either Paragraph [22 or 23]" of the Lease Agreements. Second, she asserts that "JIB did not send a default notice regarding property-tax payments, despite citing it as a termination basis the day due." We need not reach the second point because Garner cannot prevail on the first, and it is dispositive.

The trial court correctly instructed the jury in Question No. 17 that Paragraph 22 of the Lease Agreements stated that "[t]ermination or default . . . of the Franchise Agreements . . . shall terminate this Lease, without further notice being required." In our discussing Question Nos. 14 and 15 above, we explained why the evidence is legally and factually sufficient to support the jury's findings that J&D did not do all the significant things it was required to do under the Franchise Agreements before

---

[19]Question No. 17 was not conditioned on any other jury questions.

38

termination—in other words, the evidence supported the jury's determination that J&D had defaulted—and that J&D's nonperformance was not excused. Thus, Garner cannot show that the evidence is legally or factually insufficient to support the jury's finding that JIBED breached the Lease Agreements by terminating them based on J&D's unexcused defaults. *See Francis*, 46 S.W.3d at 242; *Pool*, 715 S.W.2d at 635. We overrule Garner's first and fourth issues to the extent they complain about her claims for breach of the Lease Agreements.

## V.  The Implied-Covenant Claim Against JIB

In her first, fourth, and sixth issues, Garner complains that the trial court should not have rendered judgment that she take nothing on her implied-covenant claim against JIB. She argues that (1) the trial court erred by disregarding affirmative jury findings on Question Nos. 10–12 (implied-covenant liability) and No. 13 (damages);[20] (2) the jury should not have adversely answered Question No. 9 (noncompliance); and (3) alternatively, the trial court should not have submitted

---

[20]JIB contends that Garner waived her challenge to the JNOV on her implied-covenant claim by failing to attack on appeal every independent ground for JNOV. Citing *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119 (Tex. 1970), Garner responds that her first issue globally challenges the JNOV, and she argues that she adequately addressed each of its grounds. Because we are to decide appeals on the merits whenever reasonably possible—instead of deciding issues on briefing waiver—and because it is reasonably possible to do so here, we will do so. *See St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214, 216 (Tex. 2020).

39

Question Nos. 9 and 10 (excuse from noncompliance).[21] As we will explain, the trial properly disregarded the findings on Question Nos. 11–13.[22]

## A. JNOV standard of review

A trial court should disregard a jury finding if the question to which the finding responds is legally defective, as the answer to a legally defective question is immaterial to the judgment. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 505 (Tex. 2018); *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994). Additionally, a trial court may disregard a jury's finding and render a JNOV if no evidence supports the jury's findings on issues necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). A directed

---

[21]JIB also advanced several theories about supposed fatal conflicts in the jury's answers. But as Garner pointed out to the trial court, because JIB did not object to any alleged fatal conflicts in the jury's answers before the jury was discharged, the trial court could not have granted JIB's requested JNOV based on any such conflict. *See* Tex. R. Civ. P. 295; *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 787–88 (Tex. 2021). Thus, JIB failed to preserve its fatal-charge-conflicts arguments.

[22]Concerning JIB's argument that Garner cannot challenge the jury's adverse findings because she "did not ask the trial court to disregard any unfavorable jury findings" in moving for judgment, the supreme court has recognized that "[t]here must be a method by which a party who desires to initiate the appellate process may move the trial court to render judgment without being bound by its terms." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 67 (Tex. 2015) (quoting *First Nat'l Bank v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989)). Here, Garner filed a qualified motion for final judgment and a qualified motion to vacate and modify the final judgment as authorized by—and in conformity with—*Fojtik* and preserved her right to challenge the jury's adverse findings. *See id.*; *Edes v. Arriaga*, No. 05-17-01278-CV, 2019 WL 2266391, at *3 (Tex. App.—Dallas May 24, 2019, no pet.) (mem. op.).

verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the movant's right to judgment or negates the opponent's right or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

To determine whether the trial court erred by rendering a JNOV, we test legal sufficiency while viewing the evidence in the light most favorable to the jury's finding. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). This means we must credit evidence favoring the jury's finding if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009); *City of Keller*, 168 S.W.3d at 827. We will uphold the trial court's JNOV only if no evidence supports the jury's finding on a vital fact or if the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810.

Thus, we must reverse the JNOV if more than a scintilla of evidence supports the jury's finding. *Wal-Mart Stores, Inc.*, 102 S.W.3d at 709. Evidence exceeds a scintilla when it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "[E]very reasonable inference deducible from the evidence is to be indulged in" support of the jury's finding. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Havner*, 953 S.W.2d at 711); *City of Keller*, 168 S.W.3d at 822. When, as here,

41

the trial court gives no basis for its JNOV and the motion presented multiple grounds, the appellant must show that the JNOV cannot be sustained on any of the stated grounds. *Sbrusch*, 818 S.W.2d at 394.

## B. California's implied covenant of good faith and fair dealing

Under California law, "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement*." Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 726 (Cal. 1992) (citation modified). The elements for breach-of-contract and breach-of-implied-covenant claims are similar. For a breach-of-contract claim, a plaintiff must prove (1) a contract's existence, (2) the plaintiff performed or was excused for nonperformance, (3) the defendant breached, and (4) the plaintiff was damaged. *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App. 2011). For an implied-covenant claim, only the third element differs, and a plaintiff must prove that the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract. *See Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 160 Cal. Rptr. 3d 718, 729–30 (2013); *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 14 Cal. Rptr. 2d 335, 338 (Cal. Ct. App. 1992); *see also* CACI No. 325 (California's pattern jury instructions for breach of the implied covenant of good faith and fair dealing).

## C. Garner's implied-covenant-claim allegations

In her implied-covenant claim, Garner alleged that "JIB breached the Franchise Agreement[s] for the reasons stated above in Count 1 [Breach of Franchise

42

Agreement]." In Count 1, her breach-of-contract claim, Garner complained about JIB's unreasonably withholding consent to J&D's proposed sales, improperly terminating the Franchise Agreements, not paying J&D under Section 18.G of the Franchise Agreements (concerning paying J&D fair market value for certain assets J&D surrendered), and "scuttl[ing] [J&D's] ability to sell the Franchises," which Garner alleged prevented J&D from paying its creditors and caused its bankruptcy.

Garner also alleged, "To the extent that JIB's actions and inactions are found not to constitute an express breach of the Franchise Agreements, they are at minimum a breach of the implied covenant of good faith and fair dealing." She then specifically complained about JIB's delaying and "unreasonably withholding consent to the proposed sales to the Durrett[–Hidalgo] Group and the [Dominguez–]Hidalgo Group," "wrongful termination of the Franchise Agreements[,] . . . re-taking control of the Franchises to resell them for its own benefit," "[a]cting with a hidden agenda," and "interfering with [J&D's] agreement to sell its franchised restaurants to Umar Ibrahim for $10,611,000."

## D. The charge's implied-covenant-claim questions

The court's charge presented the implied-covenant claim in Question Nos. 9–13, asking about J&D's nonperformance and excuse, JIB's implied-covenant liability, and damages. Question No. 9 asked, "Did J&D do all, or substantially all, of the significant things that the Franchise Agreements required it to do?" Because the jury answered "no," it was instructed to answer Question No. 10: "Was J&D excused

43

from having to do all, or substantially all, of the significant things that the Franchise Agreements required it to do?"

The jury answered "yes" to Question 10, so it then answered Question No. 11: "Did JIB breach its implied duty of good faith and fair dealing by unfairly interfering with J&D's right to receive the benefit of the Agreements?"[23] The jury answered "yes," so it then answered Question No. 12: "Was J&D harmed by JIB's unfair interference, if any?" Again, the jury answered "yes," so it answered Question No. 13:

> **What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff for the damages, if any, that resulted to J&D due to JIB's unfair interference, if any?**
>
> Consider the following elements of damages, if any, and none other:
>
> The fair market value of J&D's Restaurants at any time between November 10, 2016, and May 1, 2017.
>
> . . . . [Indentation altered.]

The jury answered Question No. 13, "$8,000,000.00."

## E. JIB owed no implied duty of good faith and fair dealing under the Lease Agreements

JIB argues that the trial court properly disregarded the jury's finding on Question No. 11 that JIB "breach[ed] its implied duty of good faith and fair dealing

---

[23]JIB made a number of *Casteel* objections concerning the court's submission of Garner's implied-covenant claim and raises a related conditional cross-point on appeal, *see Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), but in light of our other holdings, we need not reach JIB's cross-point or the parties' respective arguments about how to otherwise reconcile the jury's answers, *see* Tex. R. App. P. 47.1.

by unfairly interfering with J&D's right to receive the benefit of the Agreements" because the charge defined "Agreements" to mean collectively the Franchise Agreements and the Lease Agreements. JIB argues that (1) it did not owe a duty of good faith and fair dealing under the Lease Agreements and (2) the evidence is legally insufficient to support the jury's finding that it breached a covenant of good faith and fair dealing as to the "Agreements." We agree.

The Lease Agreements provide that Texas law governs, and the Supreme Court of Texas has "long held that there is not an implied covenant of good faith and fair dealing in every contract." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 491 (Tex. 2019) (collecting cases). JIB objected to Question No. 11's submission because there was "no implied covenant or duty of good faith and fair dealing under all the agreements."[24]

Because JIB did not owe J&D an implied duty of good faith and fair dealing under the Lease Agreements, as a matter of law, Garner was precluded from recovering for a breach of the duty of good faith and fair dealing concerning the Lease Agreements, and Question No. 11 erroneously permitted such recovery. Accordingly, the trial court properly disregarded the jury's "yes" finding on Question No. 11—which had asked the jury to assess the breach of a nonexistent duty as to the

---

[24]JIB also raised the issue in its motion for JNOV. *See* Tex. R. Civ. P. 301; *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 795, 797 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Lease Agreements—and to the related Question Nos. 12 and 13. *See Menchaca*, 545 S.W.3d at 506 (stating that jury questions that should not have been submitted are immaterial); *see also Jang Won Cho*, 572 S.W.3d at 797–99, 815–16 (holding that jury's breach-of-fiduciary-duty findings should have been disregarded because no fiduciary relationship existed as a matter of law); *Kirk v. Precis, Inc.*, No. 2-05-297-CV, 2006 WL 3627119, at *6 (Tex. App.—Fort Worth Dec. 14, 2006, pet. denied) (mem. op.) (upholding trial court's JNOV on negligence claim because, as a matter of law, the appellee owed no legal duty to appellant).

## F. No evidence that JIB breached the Lease Agreements

In addition, considering the inclusion of the Lease Agreements in Question No. 11, the evidence is legally insufficient to support the jury's "yes" finding on that question. Because Garner did not object to the collective inclusion of the Lease Agreements in the charge's definition of the term "Agreements"—a definition she proposed—we measure the evidentiary sufficiency by the court's charge as submitted. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

The evidence conclusively establishes that there were no Lease Agreements between JIB and J&D, so JIB could not have breached an implied covenant by unfairly interfering with J&D's rights to receive the benefits of the Lease Agreements. *See Racine & Laramie*, 14 Cal. Rptr. 2d at 339 ("There is no obligation to deal fairly or in good faith absent an existing contract."). The evidence is thus legally insufficient to

46

support the jury's finding that JIB "breach[ed] its implied duty of good faith and fair dealing by unfairly interfering with J&D's right to receive the benefit of the *Agreements*" (Question No. 11) and the related harm and damages questions (Question Nos. 12 and 13). [Emphasis added.]

Garner responds that the Franchise Agreements and the Lease Agreements were "interlocked" and "interdependent." She points to the cross-compliance and -termination clauses in both sets of agreements to argue that JIB's interference with the Franchise Agreements necessarily caused JIB to interfere with the Lease Agreements. Garner asserts that "JIB used its franchise-agreement rights, from which the good-faith duty arose, to unfairly interfere with J&D's benefits of both agreements," but she does not show that the Franchise Agreements imposed a specific contractual obligation on JIB with respect to the Lease Agreements. Garner is attempting to engraft an implied duty owed under the Franchise Agreements onto the Lease Agreements (1) when no implied duty arose under Texas law as to the Lease Agreements and (2) in contravention of California law resting an implied duty "upon the existence of some specific contractual obligation." *See id.* at 338. Accordingly, there is no evidence that JIB breached any implied duty of good faith under the Lease Agreements, so the trial court properly disregarded the jury's findings on Question Nos. 11–13.

**G. Garner's implied-covenant claim was superfluous**

But even if Garner could overcome the duty and evidentiary issues related to Question No. 11's inclusion of the Lease Agreements, JIB argues that the trial court properly disregarded the jury's findings on Question Nos. 11–13 because they were superfluous under California law. We agree.

The California Supreme Court has explained that the implied covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1110 (Cal. 2000). When a party's implied-covenant claim "rel[ies] on the same alleged acts, simply seek[ing] the same damages or other relief already claimed in a companion" breach-of-contract claim, the implied-covenant claim "may be disregarded as superfluous." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 400 (Cal. Ct. App. 1990); *see Bionghi v. Metro. Water Dist. of So. Cal.*, 83 Cal. Rptr. 2d 388, 396 (Cal. Ct. App. 1999); *JB Bros., Inc. v. Chung*, No. 2:24-CV-01994, 2024 WL 4404953, at *2 (C.D. Cal. Aug. 12, 2024) ("In most cases, . . . a separate implied[-]covenant claim, based on the same breach, is superfluous.").

Here, that is the case. Garner's implied-covenant claim was premised on the allegations in her breach-of-contract claim and sought the same damages. She specifically complained that JIB's actions concerning delaying its decisions about J&D's proposed sales and not allowing J&D to sell to its proposed buyers prevented J&D from paying its creditors, forcing J&D into bankruptcy. As JIB points out,

Garner's implied-covenant allegations were the mirror image of her breach-of-contract allegations.

In addition, Garner sought the same damages in the form of J&D's fair market value as allegedly established by the proposed purchase prices of the three unconsummated sales: (1) $13 million from the Durrett–Hidalgo Group, (2) $10,611,000 from Umar Ibrahim, and (3) $10.5 million from the Dominguez–Hidalgo Group.[25] Garner claims that evidence of these three lost sales supported both her breach-of-contract claims and her implied-covenant claim. Because Garner's implied-covenant claim substantively echoed her breach-of-contract claim, the trial court properly disregarded the jury's findings on Question Nos. 11–13. *See Guz*, 8 P.3d at 1110; *Carma Devs.*, 826 P.2d at 729–30 (reversing judgment for plaintiff on implied-covenant claim when defendant's "termination of the lease . . . to claim for itself appreciated rental value of the premises was expressly permitted by the lease" and was "clearly within the parties' reasonable expectations"); *Careau & Co.*, 272 Cal. Rptr. at 400.

---

[25]Garner's proposed charge suggested "the amount of money, if any, J&D would have received from" the sales as the damages measure for both her contractual and implied-covenant claims; the trial court used fair market value for both claims. During closing arguments, Garner argued that the jury should award in the range of $10.5 to $13 million on the implied-covenant claim—the same figures she argued should be awarded for her breach-of-contract claims.

Because the trial court properly disregarded the jury's findings on Question Nos. 11–13, we overrule Garner's first issue that the trial court erred by rendering judgment that she take nothing on her implied-covenant claim.[26]

## VI.  The CUPA Claim Against "Jack in the Box"

Garner argues in her first, fourth, and sixth issues that the trial court erred by rendering judgment that she take nothing on her CUPA claim against the JIB Parties. She alternatively requests a new trial based on the zero damages finding. As we will explain, the trial court did not err by rendering judgment that Garner take nothing on her CUPA claim.

### A.  The applicable law

CUPA "safeguard[s] the public against the creation or perpetuation of monopolies and . . . foster[s] and encourage[s] competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent[,] and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal. Bus. & Prof. Code § 17001. Pertinent to this case, CUPA prohibits secret payments or allowances:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

---

[26]We need not address Garner's other implied-covenant-claim issues, including whether she presented legally sufficient evidence of fair market value through J&D's unconsummated contracts to sell its restaurants. *See* Tex. R. App. P. 47.1.

*Id.* § 17045. Two types of competitors may raise a Section 17045 claim: (1) a competitor of the person granting the secret rebate—a competitor in the "primary line of commerce"; and (2) a competitor of the person receiving the rebate—a competitor in the "secondary line" of commerce. *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 931 P.2d 290, 295 (Cal. 1997).[27]

## B. Garner's CUPA allegations

Garner sued "Jack in the Box"—an undefined term in her petition—for allegedly violating Section 17045.[28] *See* Cal. Bus. & Prof. Code § 17045. Garner alleged that "Jack in the Box '*sells*' (as [defined in CUPA]) Jack in the Box franchises." She alleged that J&D had attempted to enter that franchise-selling market through its 2016–2017 attempted sale of its 31 restaurants. She also alleged that "Defendant Jack in the Box" was simultaneously selling Jack in the Box franchises and wanted to acquire some or all of J&D's franchises "at low or no cost in order to package them with other franchises" to facilitate "Jack in the Box's own sales."

---

[27]The JIB Parties argue that Garner's CUPA claim should not have been submitted because (1) Garner's CUPA claim "falls outside the narrow choice-of-law provision in the Franchise Agreements"; (2) "CUPA does not apply to extraterritorial conduct in Texas"; and (3) "CUPA does not apply to the conduct at issue." We need not reach these arguments. *See* Tex. R. App. P. 47.1

[28]As we mentioned above, when Garner filed her fourth amended petition, she changed her CUPA allegations from targeting the "JIB Parties"—a defined name for both JIB and JIBED—to "Jack in the Box"—an undefined name.

Garner claimed that J&D learned that "Jack in the Box was giving rent relief and royalty relief to other franchisees." She alleged that J&D repeatedly asked for the same relief for itself that "Jack in the [B]ox had been secretly giving to other existing Jack in the Box franchisees." According to Garner, the "refusal to give J&D the same type of rebates and unearned discounts other franchisees had been receiving financially weakened" it and contributed to its being "forced" to try to sell its franchises for "millions of dollars below the price it had to pay Jack in the Box five years previously to obtain them."

Garner claimed that "Jack in the Box's actions in not giving rebates and unearned discounts to J&D for royalty payments and rentals as it did to other franchisees . . . injured . . . its competitor J&D in the same market for sale of Jack in the Box franchises," "destroy[ed] competition in the sale of Jack in the Box franchises[,]"and "eliminat[ed] J&D as a competitor." Garner claimed that J&D had suffered "substantial damages" and sued for "its actual damages, a number somewhere between $10,500,000 and $13,000,000 to be trebled" under CUPA.[29]

---

[29]Although Garner generically complains about "Jack in the Box," her allegations substantively complain about JIBED—the entity that gave the rent and royalty relief and allowed restaurant closures as part of the refranchising sales. For example, in her brief, Garner points to the purchase agreements involving J&D's restaurants—all of which JIBED signed. She also cites an email from Eric Tunquist, who at that time was the Vice President of Easten Division Operations.

## C. The charge's CUPA questions

Garner failed to clearly plead whom she intended to sue or whether she was alleging that J&D was a primary-line competitor of "Jack in the Box" in terms of selling its franchises or a secondary-line competitor of "Jack in the Box's" other franchisees. She asserts both on appeal: "J&D stood as a buyer of franchisee benefits from JIB and as a seller of its franchises to willing buyers without privileges, while JIB offered privileges to other buyers and itself as seller." But when the trial court submitted the CUPA liability questions to the jury, it submitted those questions as to JIB only as a primary-line competitor—as Garner had requested in her proposed jury questions. *See* CACI No. VF-3306 (California's pattern verdict form for secret rebates).

The trial court submitted Garner's CUPA-liability theory in Question Nos. 22–25, each of which the jury answered "yes":

**Question No. 22**

**Did JIB secretly give unearned discounts or privileges to some buyers that were not given to other buyers purchasing on like terms and conditions?**

. . . .

**Question No. 23**

**Was a competitor harmed as a result of JIB's secret unearned discounts or privileges, if any?**

. . . .

53

**Question No. 24**

Did the secret unearned discounts or privileges, if any, have a tendency to destroy competition?

. . . .

**Question No. 25**

Was JIB's conduct, if any, found in Question No. 22 a substantial factor in causing J&D's harm, if any?

Regarding CUPA damages, the trial court instructed the jury to consider each of the following three measures of damages, and the jury answered $0.00 to each:

A. The amount of money, if any, J&D should have received in royalty relief from JIB or JIBED.

B. The amount of money, if any, J&D should have received in rent relief from JIB or JIBED.

C. The amount of money, if any, J&D should have saved if JIB or JIBED had allowed J&D to close or offset its underperforming restaurants.[30] [Indentation altered.]

## D. JIBED's omission from the CUPA liability questions

Garner maintains that the trial court committed error by not submitting JIBED (along with JIB) in Question No. 22 (regarding the provision of unearned discounts or privileges), but she waived this complaint.

A party objecting to a charge "must point out distinctly the objectionable matter and the grounds of the objection." Tex. R. Civ. P. 274; *Spencer*, 876 S.W.2d at

---

[30]The trial court refused Garner's request to include an additional damages measure: "D. The amount of money, if any, J&D would have received for selling the J&D Restaurants to Umar Ibrahim."

157; *see* Tex. R. App. P. 33.1(a)(1)(A). And as we have previously noted, a party may not complain of charge error that she invited. *See Gen. Chem. Corp.*, 852 S.W.2d at 920; *Lakota Energy Ltd. P'ship v. Merit Mgmt. Partners I, L.P.*, No. 02-13-00057-CV, 2016 WL 6803181, at \*4 (Tex. App.—Fort Worth Nov. 17, 2016, pet. denied) (mem. op.) ("[Appellant's] acquiescence to and affirmative request for the complained of question invited the error [it] now complains of; thus, [it] cannot now assert that the trial court committed error by giving [it] exactly what it asked for.").

The first morning of the two-day formal charge conference, Garner filed her "First Supplemental Proposed Jury Charge – Phase 1." In her proposed CUPA liability questions,[31] Garner did not request JIBED's inclusion and requested that only JIB be included in the proposed CUPA liability questions. The trial court submitted the CUPA liability questions solely as to JIB because that is what Garner requested, and Garner cannot complain of alleged error that she invited.[32] *See id.*

Accordingly, because the jury made no CUPA liability finding as to JIBED—a separate legal entity from JIB, *see BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d

---

[31]Garner's proposed version of Question No. 22 asked, "Did JIB secretly give discounts or privileges to some buyers that were not given to other buyers purchasing on like terms and conditions?"

[32]Garner argues that she preserved error, claiming that she objected to JIBED's omission from Question No. 22. But Garner did not actually object to Question No. 22's omission of JIBED. Instead, she objected to the trial court's omission of JIBED from the CUPA damages question—Question No. 26—which objection the trial court sustained.

789, 798 (Tex. 2002)—the trial court properly rendered judgment that Garner take nothing on any CUPA claim against JIBED, *see* Tex. R. Civ. P. 301; *see also Canales v. Vandenberg*, 699 S.W.3d 666, 674 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) (stating that party seeking a liability finding against multiple defendants "was required to submit jury questions on liability for each individual defendant").

But that was not the only consequence of solely submitting JIB in the CUPA liability questions. As we will explain, Garner's requested submission of JIB—instead of JIBED—doomed Garner's CUPA claim as to JIB as well.

## E. No evidence supports JIB's CUPA liability

Garner maintains that the trial court improperly disregarded the jury's CUPA liability findings regarding JIB because legally and factually sufficient evidence supports the jury's answers to Question Nos. 22–25. We disagree.

In arguing that the evidence supports those findings, Garner points to testimony that "Jack in the Box" denied J&D's requests to close the unprofitable "bad store[s]" and its requests for financial relief. Importantly, Garner did not elicit testimony specifically delineating which Jack in the Box entity J&D was seeking such relief from—the cited testimony generically referenced "Jack in the Box." And as JIB argues in its brief—which the documentary evidence undisputedly supports—JIBED provided "the so-called 'relief' afforded to 'other franchisees'"—"not JIB."

Indeed, the various purchase agreements and related documents conclusively show that JIBED was the party who made these decisions for J&D and the other

franchisees. For example, J&D's 2011 Purchase Agreement stating J&D's rent and royalty fees recited that JIBED "[wa]s the owner of the [37 identified] JACK IN THE BOX restaurant businesses" and that JIBED agreed with J&D on the terms of the rent and royalty fees. Thus, under J&D's 2017 surrender agreement, J&D surrendered possession and control of its remaining 31 restaurants and related assets to JIBED—not JIB.

Similarly, when J&D's restaurants were repackaged in 2017 and 2018 into various tranches with other formerly-corporate-operated stores and sold to new franchisees, JIBED—not JIB—entered into purchase agreements for each transaction. JIBED and each buying group, none of which was dealing with the entire grouping of J&D's original 37 stores, negotiated agreements that included store closures and other financial "relief" concerning rent and royalties. Again, the evidence conclusively demonstrates that JIB was not a party to any of these 2017 and 2018 purchase agreements; JIBED was.

Yet the threshold CUPA liability question—No. 22—asked whether "*JIB* secretly gave unearned discounts or privileges." [Emphasis added.] The evidence conclusively demonstrates that JIBED—not JIB—was the party that negotiated and set the terms of all the purchase agreements, including the decisions about store closures and rent and royalty relief. *See City of Keller*, 168 S.W.3d at 810. Because no evidence supports the jury's findings that JIB gave any unearned discounts or

privileges, the trial court properly disregarded the jury's affirmative CUPA liability findings.[33] *See id.* We overrule the CUPA complaints Garner raises in her first issue.[34]

## VII. Attorney's Fees

In her third issue, Garner complains that the trial court erred by refusing to award her attorney's fees for her CUPA and implied-covenant claims. CUPA Section 17082 provides that a plaintiff is entitled to attorney's fees in pursuing a CUPA claim when "judgment is entered against the defendant." Cal. Bus. & Prof. Code § 17082.

---

[33]We need not even determine whether it was JIB or JIBED that gave the allegedly unearned discounts or privileges because we additionally conclude that Garner's compared transactions were not on "like terms and conditions." *See* Cal. Bus. & Prof. Code § 17045. Assuming for argument's sake that J&D was a JIB competitor in selling franchises, J&D's attempted 2016 and 2017 sales of its remaining 31 restaurants were not "on like terms and conditions" as the three sales JIBED made in 2017 and 2018, which involved the grouping of a subset of J&D's restaurants with other restaurants from differing localities into three separate sales groups. And each refranchised J&D restaurant was in a different physical and financial condition than when J&D was operating and trying to sell its collective group of 31 distressed restaurants in 2016 and 2017. *Compare SDMS, Inc. v. Rocky Mountain Chocolate Factory, Inc.*, No. 08 CV 0833 JM AJB, 2008 WL 4838557, at *5 (S.D. Cal. Nov. 6, 2008), *with Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of S.F.*, 7 Cal. Rptr. 3d 628, 635 (Cal. Ct. App. 2003), *and Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 20 Cal. Rptr. 2d 62, 70 (Cal. Ct. App. 1993). In short, the evidence conclusively established that the sales of the repackaged Jack in the Box franchises in 2017 and 2018 were not on like terms and conditions to J&D's attempted 2016 and 2017 sales of its collective 31 franchises. *See City of Keller*, 168 S.W.3d at 810. Accordingly, on this additional basis, the trial court did not err by disregarding the jury's findings on the CUPA liability questions. *See id.*

[34]Because the trial court properly disregarded the jury's findings on the CUPA liability questions, we need not address those portions of Garner's fourth or sixth issues complaining of the jury's finding zero damages on—or any alleged charge error in—the CUPA damages question (No. 26). *See* Tex. R. App. P. 47.1.

And as for Garner's implied-covenant claim, the Franchise Agreements provide that the prevailing party may seek its attorney's fees.

Here, the trial court properly rendered a take-nothing judgment against Garner on her CUPA and implied-covenant claims, so she was not entitled to attorney's fees. Accordingly, the trial court did not err by refusing her attorney's-fees request. We overrule Garner's third issue.

## VIII. The TUFTA, UCC, DTPA, and Fraud-by-Nondisclosure Claims

In her second issue, Garner asserts that a new trial should be granted because the trial court erred by granting a partial summary judgment disposing of her TUFTA, UCC, DTPA, and fraud-by-nondisclosure claims. The JIB entities respond that either (1) Garner has waived her complaints or (2) summary judgment should be affirmed. We need not address whether Garner waived these complaints because we uphold the trial court's ruling on the merits.

## A. Traditional-summary-judgment standard of review

The JIB Parties filed traditional and no-evidence summary-judgment motions. Because the trial court denied the no-evidence motion, we consider only the traditional-summary-judgment grounds.

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors

59

could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Phan Son Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

## B. TUFTA

Garner argues that the trial court erred by granting summary judgment on her TUFTA claims against JIB, but she has not shown harm. *See* Tex. R. App. P. 44.1(a).

The harmless-error rule applies to all errors, including in the summary-judgment context. *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011); *see* Tex. R. App. P. 44.1. Under that rule, a trial court's error is reversible only if it probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). Subsequent events in the trial court can render an erroneous summary judgment harmless. *Progressive Cnty. Mut. Ins. v. Boyd*, 177 S.W.3d 919, 921–23 (Tex. 2005) (holding erroneous summary judgment in favor of insurer on insured's extracontractual claims was rendered harmless by subsequent jury verdict of no contractual coverage); *see G & H Towing Co.*, 347 S.W.3d at 296–98 (holding

60

erroneous grant of summary judgment on vicarious-liability ground not presented in motion was harmless based on court of appeals' holding that employee had not committed tort). Ultimately, it is the complaining party's burden to show harm on appeal. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009).

Garner does not address harm under her TUFTA argument. But instead of disposing of the issue based on Garner's briefing, *see* Tex. R. App. P. 38.1(i), we conclude that the jury's adverse findings on Question Nos. 14, 15, and 17—finding J&D's unexcused default of the Franchise Agreements and rejecting Garner's claim for breach of the Lease Agreements—rendered harmless any error in the trial court's granting of summary judgment on Garner's TUFTA claim, *see* Tex. R. App. P. 44.1(a)(1); *Boyd*, 177 S.W.3d at 921–23.

On May 1, 2017—months after the termination of the Franchise and Lease Agreements—the JIB Parties and J&D signed the surrender agreement through which J&D surrendered possession and control of the 31 restaurants "and associated assets" to JIBED. After taking over operations at the 31 restaurants and working out deals with J&D's lienholders, JIB sent a November 20, 2017 UCC notice proposing to retain J&D's assets, "specifically including equipment, trade fixtures, accessions, and related material," in which JIB claimed a security interest, in exchange for "full satisfaction" of J&D's obligations to JIB. Neither J&D nor Garner responded.

In her TUFTA claims, Garner alleged that "[t]he [May 1, 2017 and November 20, 2017] transfer of the Franchises and related assets [we]re fraudulent transfers

under" Sections 24.005(a)(2) and 24.006(a) of TUFTA, claiming that J&D "did not receive reasonably equivalent value in exchange for the transfer of its assets to JIB."[35] *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2), 24.006(a). Garner sought to avoid those transfers.

But TUFTA provides as follows: "A transfer is not voidable under Section 24.005(a)(2) or Section 24.006 of this code if the transfer results from . . . termination of a lease upon default by the debtor when the termination is pursuant to the lease and applicable law." *Id.* § 24.009(e)(1). The evidence at trial demonstrated that the transfers at issue resulted from the termination of a lease upon J&D's default and the JIB Parties' enforcement of a security interest. *See id.*

As we have discussed above, Garner asked the jury whether J&D had done all it needed to do to comply with the Franchise Agreements before termination and whether its noncompliance was excused, and the jury answered both questions "no"—that is, the jury found that J&D's pre-termination defaults were not excused. We have determined that those findings have legally and factually sufficient evidentiary support and that the evidence supports the jury's "no" finding on Question No. 17 asking whether JIBED breached the Lease Agreements by terminating them upon J&D's default.

---

[35]In the surrender agreement, J&D agreed to transfer its assets back to JIBED.

Consequently, the jury's findings adverse to Garner on Question Nos. 14, 15 and 17 conclusively demonstrate that the complained-of surrender and transfer of J&D's assets occurred as a result of the termination of the Franchise and Lease Agreements upon J&D's default. Section 24.009(e) precludes Garner's attempted avoidance of the alleged transfers. *See id.* Any error in the trial court's summary-judgment TUFTA ruling is harmless. *See* Tex. R. App. P. 44.1(a); *Boyd*, 177 S.W.3d at 921–23.

## C. UCC

Garner challenges the trial court's summary judgment disposing of her claim alleging a violation of the duty of good faith and fair dealing under either Texas's or California's UCC.[36] We conclude that the trial court properly granted summary judgment on Garner's UCC bad-faith claim.

Section 1.304 of the UCC states, "Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." Tex. Bus. & Com. Code Ann. § 1.304; *see* Cal. Com. Code § 1304. But the comments to the UCC expressly clarify that this statute does not create an independent bad-faith cause of action under the UCC:

---

[36]No party filed a Rule 202 motion. *See* Tex. R. Evid. 202. Nor has any party argued that Texas's or California's version of the UCC governs or that any difference exists between them. Although we cite both statutes, we will presume that California's version is identical to Texas law. *See Collins v. Tex Mall, L.P.*, 297 S.W.3d 409, 414 (Tex. App.—Fort Worth 2009, no pet.).

> *This section does not support an independent cause of action for failure to perform or enforce in good faith.* Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, [a remedial] right or power.

Tex. Bus. & Com. Code Ann. § 1.304 cmt. 1 (emphasis added); *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606–07 (Tex. 1998) (refusing a bad-faith claim under the UCC); *see* Cal. Com. Code § 1304 cmt. 1. Thus, the JIB Parties moved for summary judgment on the ground that Garner's standalone UCC bad-faith claim failed as a matter of law.

In response, Garner has argued that the comments to Section 9.620 of the Texas UCC and Section 9620 of the California UCC override the above-quoted comments disallowing an independent UCC bad-faith cause of action by stating that "Section 1-304 imposes an obligation of good faith on a secured party's enforcement under this Article. This obligation may not be disclaimed by agreement." Tex. Bus. & Com. Code Ann. § 9.620 cmt. 11; *see* Cal. Com. Code § 9620 cmt. 11. Specifically, Garner claims that she should be able to pursue the JIB Parties for their alleged bad faith in failing to disclose various facts in their November 20, 2017 UCC notice.

But if Garner wanted to sue a secured party for allegedly failing to comply with the UCC, her remedy was not a standalone UCC bad-faith claim. Section 9.625 "provide[s] the basic remedies afforded to those aggrieved by a secured party's failure to comply with this Article." Tex. Bus. & Com. Code Ann. § 9.625 cmt. 2; *see* Cal. Com. Code § 9625 cmt. 2. Garner did not cite this Section in her pleading,

summary-judgment response, or appellate briefing as forming the basis of her UCC bad-faith claim. *See* Tex. Bus. & Com. Code Ann. § 9.625; Cal. Com. Code § 9625. Because Garner did not assert such a claim and has asserted only a nonexistent, standalone UCC bad-faith claim, the trial court properly granted summary judgment on that claim.[37] *See N. Nat. Gas Co.*, 986 S.W.2d at 606–07.

## D. DTPA and fraud by nondisclosure

Garner sued the JIB Parties for alleged violations of the DTPA and for fraud by nondisclosure, and the trial court rendered judgment that Garner take nothing on either claim. We will set out the economic-loss rule and explain why Garner's DTPA and fraud claims fail under that rule.

### 1. Economic-loss rule

"The economic[-]loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). As this court has previously explained,

---

[37]Neither of Garner's cited cases holds that a debtor may assert a standalone UCC bad-faith claim against a creditor. *See Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 597 (Tex. 2010) (recognizing that to recover a deficiency, a secured creditor "must prove that it acted in a 'commercially reasonable' manner in disposing of collateral"); *Ford & Vlahos v. ITT Com. Fin. Corp.*, 885 P.2d 877, 878 (Cal. 1994) (holding that a prior version of California's UCC did not "definitively limit[] a secured party's duty to advertise the sale of collateral merely to placing a legal notice in a newspaper").

In determining whether the plaintiff may recover on a tort theory, it is instructive to examine the nature of the plaintiff's loss. [*Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)]. When the only loss or damage is to the subject matter of the contract, the plaintiff's claim will only sound in contract. *Id.* In operation, the rule restricts contracting parties to contractual remedies for those economic losses associated with the relationship, even when the breach might reasonably be viewed as a consequence of a contracting party's [tortious conduct]. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.").

*JPMorgan Chase Bank, N.A. v. Prof'l Pharm. II*, 508 S.W.3d 391, 422 (Tex. App.—Fort Worth 2014, no pet.); *see Bell v. Bay Area RV Parks, L.L.C.*, No. 01-23-00453-CV, 2025 WL 1737942, at *27 (Tex. App.—Houston [1st Dist.] June 24, 2025, no pet.) ("A claim sounds in tort when the alleged duty breached is independent of the contract and the harm suffered is not merely the economic loss of a contractual benefit." (citing *Chapman Custom Homes*, 445 S.W.3d at 718)).

## 2. Garner's DTPA allegations

Garner alleged that the JIB Parties violated the DTPA by acting unconscionably toward J&D through the following conduct:

- failing to develop and employ a cogent marketing strategy in the areas where J&D's restaurants were located;

- claiming that J&D had breached the Franchise and Lease Agreements;

- refusing to acknowledge that J&D had cured alleged defaults or tell J&D what it needed to do to cure such defaults;

- obstructing J&D's efforts to sell its 31 restaurants;

66

- terminating J&D's Franchise Agreements without justification or proper notice;

- failing to pay J&D in accordance with Section 18.G of the Franchise Agreements; and

- Closing certain unprofitable stores that it had not allowed J&D to close and reselling J&D's stores for the JIB Parties' profit and at the detriment of J&D and its creditors.

Here, J&D and JIB executed Franchise Agreements setting forth the rules governing the franchise relationship. Among other provisions, the Franchise Agreements included the time period over which J&D agreed to operate each restaurant; J&D's operating obligations; JIB's obligation to "develop and execute marketing programs"; and provisions governing what constituted a default and JIB's termination rights and remedies, including J&D's granting JIB a security interest in certain assets. In short, everything that Garner alleged in her DTPA claim concerned JIB's alleged failures to perform under the Franchise Agreements and the JIB Parties' actions in exercising their post-termination rights; none of J&D's alleged harm arose independently from the Franchise or Lease Agreements. *See Chapman Custom Homes*, 445 S.W.3d at 718; *see also Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 12–15 (Tex. 1996). Accordingly, under the economic-loss rule, the trial court properly rendered judgment that Garner take nothing on her DTPA claim.

### 3. Garner's fraud-by-nondisclosure allegations

Under Paragraph 8.F of the Franchise Agreements, J&D granted JIB a security interest in J&D's assets to secure certain obligations. But Garner's fraud claim

centered around JIB's post-termination November 20, 2017 UCC notice—sent "[u]nder the terms of the respective Franchise Agreements"—notifying J&D of JIB's intent to retain J&D's surrendered collateral in satisfaction of J&D's obligations under the Franchise Agreements. Tex. Bus & Com. Code Ann. § 9.620; *see* Cal. Com. Code § 9620.

Garner alleged that the JIB Parties owed J&D a duty to explain four matters that Garner claims induced her and J&D to not respond to the UCC notice:

(1) how the amount recoverable under the Franchise Agreements totaled $1,277,995.68;

(2) how JIB incurred $3,264,795.74 to secure and preserve J&D's collateral;

(3) that JIB paid $2.5 million to settle litigation with J&D's lienholders; and

(4) that JIB was going to re-sell the collateral.

Garner claimed that she and J&D's bankruptcy estate suffered "substantial damages" by the JIB Parties' "deliberate[ly] induc[ing]" her and J&D to not object to the UCC notice. Tex. Bus & Com. Code Ann. § 9.620(a)(2), (d); *see* Cal. Com. Code § 9620(a)(2), (d).

JIB's ability to claim a lien on J&D's collateral and its right to enforce that lien arose out of the provision in the Franchise Agreements' granting JIB a security interest in J&D's collateral. Garner's fraud claim arose only in the context of JIB's

exercising its contractual rights under the Franchise Agreements.[38] As with her DTPA claim, Garner's claimed harm from fraud was the same as she alleged for breach of the Franchise Agreements—the loss of the value of the restaurants after J&D surrendered them to JIBED and they were resold.

Accordingly, we hold that because the economic-loss rule barred Garner's post-termination fraud-by-nondisclosure claim, the trial court did not err by rendering judgment that Garner take nothing on that claim. *See Chapman Custom Homes*, 445 S.W.3d at 718. We overrule Garner's second issue.

## IX.  Conclusion

Having overruled Garner's six issues, we affirm the trial court's final judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  October 9, 2025

---

[38]Garner cites *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.* to argue that she has asserted a fraudulent-inducement claim that is not barred by the economic-loss rule. 960 S.W.2d 41, 46 (Tex. 1998). In *Formosa*, the court explained that "tort damages are recoverable for a fraudulent[-]inducement claim irrespective of whether the fraudulent misrepresentations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id.* at 47. But here, the economic loss Garner claims to have suffered was not from her failure to object to the UCC notice; rather, her alleged damages arose out of the conduct underlying her breach-of-contract claim—the alleged loss in value of J&D's restaurants when JIB terminated the Franchise Agreements and exercised its contractual post-termination remedies. *Formosa* is thus distinguishable.